**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| YASMINE LAMAR, Individually and on behalf of a class of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>IQ DATA INTERNATIONAL, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 20-cv-00377

Honorable Judge Gary Feinerman

Magistrate Judge Susan E. Cox

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant I.Q. Data International, Inc. ("I.Q. Data"), by and through its undersigned counsel, and pursuant to Local Rule 56.1(a)(3) hereby submits the following statement of material facts as to which I.Q. Data contends there is no genuine issue and that entitle I.Q. Data to judgment as a matter of law:

**Parties, Venue, and Jurisdiction**

1. Plaintiff Yasmine Lamar ("Plaintiff") is an individual residing in Chicago, Illinois. (**Exhibit A**, Plaintiff's First Amended Complaint ¶ 7).

2. Defendant I.Q. Data International, Inc. is a Washington corporation that collects defaulted debts owed to others. (**Exhibit B**, Defendant's Answer ¶ 9).

3. Jurisdiction of the this Court is proper under 28 U.S.C. § 1331. (Ex. B ¶ 5).

4. Venue is proper because Defendant's collection communications were received by Plaintiff within this District. (Ex. B ¶ 6).

## Background Facts

5.     Plaintiff resided in the Lake Meadows Phase I apartment complex in Chicago, Illinois, but fell behind on her rent payments. (Ex. A ¶¶ 12-13).

6.     Draper and Kramer, Inc. ("D&K"), the property management company for the Lake Meadows Phase I apartment complex, secured an eviction order against Plaintiff on August 8, 2018. (Ex. A ¶ 16).

7.     Plaintiff vacated the Lake Meadows Phase I apartment complex on August 28, 2018. (Ex. A, its Ex. C).

8.     D&K sent Plaintiff an accounting notice dated August 30, 2018 on behalf of the Lake Meadows Phase I apartment complex, stating that Plaintiff owed a balance of $3,969.10 on the rental unit. (Ex. A ¶ 18, and its Ex. C).

9.     Defendant I.Q. Data is engaged by D&K to aid in the collection of debts. (Ex. A ¶ 20; **Exhibit C**, Affidavit of Michael Gulbranson ¶¶ 4-5 and its Ex. 1, Collection Agreement).

10.     D&K referred Plaintiff's account to I.Q. Data for collection when Plaintiff did not submit payment on her account. (Ex. A ¶ 20).

## The Collection Agreement

11.     I.Q. Data and D&K are parties to a collection agreement ("Collection Agreement") under which D&K (Creditor) retained I.Q. Data (Collector) to collect D&K's accounts receivables. (Ex. C ¶ 5 and its Ex. 1).

12.     The Collection Agreement provides:

> **1.2 Creditor's Duties.** Creditor (i) warrants that the Account Information on the Delinquent Accounts are accurate, valid, true and correct…

(Ex. C ¶ 6 and its Ex. 1 ¶ 1.2).

13.    The Collection Agreement contains a warranty from D&K that it will:

(v) comply with Collector's requests for documentation, statements, photographs, invoices; and (vi) comply with requests for the Creditor to send or transmit Account Information to the Responsible Party evidencing the debt.

(Ex. C ¶ 7 and its Ex. 1 ¶ 1.2).

14.    Under the Collection Agreement, D&K expressly assumes responsibility for compliance with all applicable laws, rules, regulations, and ordinances, including local housing laws, pursuant to a provision that states:

**2.1 Contractor's Relationship.** …. Collector and Creditor  each assume full responsibility for their own compliance with any and all applicable laws, ordinances, rules and regulations, including … (b) Creditor's obligation to comply with federal, state or local housing laws, together with any laws or rules regulating a landlord/tenant relationship.

(Ex. C ¶ 8 and its Ex. 1 ¶ 2.1).

15.    The Collection Agreement contains an express Indemnification provision requiring D&K to indemnify I.Q. Data from any claims or damages to the extent those claims or damages were caused by D&K in performing its duties under the Collection Agreement or in connection with the accuracy or validity of the delinquent accounts. (Ex. C ¶ 9 and its Ex. 1 ¶ 6.1).

16.    Under the Collection Agreement, D&K "expressly warrants that all Delinquent Accounts are legally due and owing." (Ex. C ¶ 10 and its Ex. 1 ¶ 6.2).

17.    Under certain collection agreements, including the Collection Agreement with D&K, I.Q. Data performs "Pre-Collect" services before an account is formally assigned to I.Q. Data to begin its standard collection services; the Collection Agreement contains a "Pre-Collect Service" provision, which states, in relevant part:

**Pre-Collect Service:** Collector will send two (2) notices to the former resident. If the resident pays within thirty (30) days from the move out

3

> date, whether to the property directly or to Collector, the Collector's fee will be....

> If an account is not paid within thirty (30) days of the move-out date, Collector will classify the account as a standard collection service ("Non Pre-Collect").

(Ex. C ¶ 11 and its Ex. 1 at p. 5).

## Account Assignment

18.     When D&K refers an account to I.Q. Data for collection, I.Q. Data integrates with D&K's property management software, Yardi, which contains certain information related to the resident debtor and his/her account. I.Q. Data's software synchronizes with Yardi and generates I.Q. Data's own document (hereinafter referred to as the "Account Information Report") by populating a form with certain information in Yardi pertaining to the account, including the resident debtor's name, address on file, contact information, lease dates, and outstanding balance. (Ex. C ¶ 12).

19.     When I.Q. Data is referred an account by D&K, I.Q. Data is not provided any information that states whether D&K filed an eviction action against its former tenant/the debtor, or whether D&K charged its former tenant/the debtor legal fees in connection with an eviction action. (Ex. C ¶ 13).

20.     I.Q. Data relies on the express warranties of D&K in the Collection Agreement, including: the warranty that all information provided in connection to a debtor's account is accurate, valid, true and correct; the warranty that D&K assumes responsibility for compliance with all applicable laws, ordinances, rules and regulations, including compliance with federal, state, and local housing laws, and any laws or rules regulating a landlord/tenant relationship; and the warranty that "all Delinquent Accounts are legally due and owing." (Ex. C ¶ 42 and its Ex. 1 ¶¶ 1.2, 2.1, 6.2).

4

21.     The information I.Q. Data obtained from D&K when D&K referred Plaintiff's account for collection included an outstanding balance of $3,969.10 for rent and damages and an address on file for Yasmine Lamar of 3445 S. Rhodes Ave, Unit 1205, Chicago, IL 60616. (Ex. C ¶ 14 and its Ex. 2, Account Information Report).

22.     At the time Plaintiff's account was referred to I.Q. Data by D&K, I.Q. Data was not provided with any documents and was not provided with any information that indicated whether D&K filed an eviction action against Plaintiff or charged Plaintiff attorneys' fees in connection with any eviction action. (Ex. C ¶ 15).

### I.Q. Data's Initial Communication with Plaintiff

23.     I.Q. Data enters all accounts referred to it for collection in I.Q. Data's collection system and notates all attempts to collect on that account, including all actions taken with respect to the account, all correspondences sent, and all calls made or received. (Ex. C ¶ 16).

24.     Plaintiff's account was assigned to I.Q. Data for "pre-collect" service on September 7, 2018, and I.Q. Data performed "pre-collect" services with respect to the account until September 27, 2018, at which time standard collection services began. (Ex. C ¶ 20 and its Ex. 3, Account Notes, at p. 1).

25.     On or about Friday, September 7, 2018, I.Q. Data's system generated a request for a form letter entitled "00 PRECOLLECT LETTER" to be issued in connection with Plaintiff's account, and the 00 PRECOLLECT LETTER was mailed out to Plaintiff on Monday, September 10, 2018 in accordance with I.Q. Data's procedures. (Ex. C ¶¶ 17, 21-22 and its Ex. 3 at 1 and Ex. 4, Pre-Collect Letter).

26.     The 00 PRECOLLECT LETTER is a form letter which is automatically generated when I.Q. Data loads an account into its collection system as "pre-collect," and it is mailed out to

the debtor as the initial communication. (Ex. C ¶ 17).

27.     The 00 PRECOLLECT LETTER, a form letter, includes the following validation language:

> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will obtain verification of the debt or a copy of a judgment and mail you a copy of such judgment or verification.

(Ex. C ¶ 23 and its Ex. 4).

28.     For all accounts assigned to I.Q. Data for collection, whether pre-collect services are performed pursuant to the collection agreement or not, I.Q. Data's system automatically generates a request for an "R01 Letter," which is a form letter that contains the language quoted in paragraph 27 above. For accounts on which no pre-collect services are performed, the "R01 Letter" is automatically generated and sent as the first communication to the debtor. (Ex. C ¶ 24).

29.     The 00 PRECOLLECT LETTER mailed to Plaintiff on September 10, 2018 was sent to the address D&K provided to I.Q. Data as Plaintiff's address on file. (Ex. C ¶ 25 and its Exs. 2 and 4).

30.     I.Q. Data did not receive any record of the 00 PRECOLLECT LETTER sent to Plaintiff on September 10, 2018 being returned as undeliverable. (Ex. C ¶ 26 and its Ex. 3 at p. 1).

31.     The 00 PRECOLLECT LETTER mailed to Plaintiff on September 10, 2018 was I.Q. Data's initial communication with Plaintiff. (Ex. C ¶ 27 and its Ex. 3 at p. 1).

32.     I.Q. Data issued an interrogatory to Plaintiff asking her to identify her "initial communication" with I.Q. Data, and Plaintiff responded that, upon information and belief, the

initial communication was a telephone call made "during the summer of 2018." (**Exhibit D**, Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories, #4).

33.     Plaintiff does not have the initial communication with I.Q. Data, and Plaintiff has no documents evidencing the initial communication with I.Q. Data or the date on which it occurred. (**Exhibit E**, Plaintiff's Answers and Objections to Defendant's First Requests for Production, #31).

34.     Plaintiff has stated that all documents evidencing the initial communication with I.Q. Data and the date on which it was made are in Defendant's possession, custody, and control. (Ex. E, #31).

35.     I.Q. Data notates all attempts to collect on an account, including all actions taken with respect to the account, all correspondences sent, and all calls made or received, and Plaintiff's Account Notes contain no record of any calls, letters, or other communications before the 00 PRECOLLECT LETTER dated September 10, 2018. (Ex. C ¶ 28 and its Ex. 3 at p. 1).

### Policies and Procedures to Ensure Collection of Amounts Legally Due

36.     I.Q. Data maintains extensive policies and procedures designed to ensure compliance with the Fair Debt Collection Practices Act ("FDCPA") generally, and to ensure it is only collecting debts that are legally due and owing, and that it is legally authorized to collect. (Ex. C ¶ 29).

37.     As a matter of policy, I.Q. Data ensures that its contracts with creditor clients require the creditor to warrant that all information provided in connection to a debtor's delinquent account is accurate, valid, true and correct, and that all amounts referred to I.Q. Data for collection are legally due and owing. (Ex. C ¶ 30).

38.     As a matter of policy, I.Q. Data ensures that its contracts with creditor clients

require the creditor to comply with I.Q. Data's requests for documentation evidencing the debt. (Ex. C ¶ 31).

39.     As a matter of policy, I.Q. Data ensures that its contracts with creditor clients require the creditor to assumes responsibility for compliance with all applicable laws, rules, regulations, and ordinances. (Ex. C ¶ 32).

40.     As a matter of policy, I.Q. Data ensures that its contracts with creditor clients require the creditor to indemnity I.Q. Data for damages in connection with the creditor providing inaccurate information regarding validity of delinquent accounts. (Ex. C ¶ 33).

41.     All I.Q. Data employees responsible for collection activity are required to read and understand I.Q. Data's FDCPA Policy, as well as receive training on this Policy, the FDCPA, and related state law requirements, prior to engaging in collection activity. Additionally, I.Q. Data employees must also take all required refresher training, as directed by the Compliance Department and Operations Management. (Ex. C ¶ 34 and its Ex. 5 § 3.9).

42.     All I.Q. Data employees are required to partake in a two-week FDCPA training course, where the statue is covered extensively. (Ex. C ¶ 35).

43.     FDCPA training at I.Q. Data includes: (1) participatory FDCPA training modules; (2) administered testing to new employees regarding their understanding of the training modules; (3) provision of policies and standard operating procedures to employees pertaining to the collection of accounts; (4) affirmation from each employee that they have both read and agree to be bound by the policies and standard operating procedures provided them; (5) demonstration and lecture provided to employees as to how to remain compliant with the FDCPA; and (6) refresher training administered to every employee regarding their understanding of the FDCPA. (Ex. C ¶ 36).

44.    I.Q. Data maintains "Validation" policies and procedures further designed to prevent collection of debts that are not legally due and owing in the event such a debt has been referred. Specifically, these policies are designed to immediately stop collections on an account where a creditor has somehow failed to comply with its contractual obligations and has referred I.Q. Data a debt for collection that is not legally due and owing. (Ex. C ¶ 37 and its Ex. 5 § 3.2).

45.    I.Q. Data's FDCPA training for employees includes education on provisions of the FDCPA regarding validation notice and the validation procedure, including the purpose and goal of validation, required contents of the validation notice, timing on when the validation notice must be sent, what to do when a consumer disputes the debt, and how to respond to and handle a dispute. (Ex. C ¶ 38).

46.    I.Q. Data's FDCPA Policy requires a validation notice to be mailed prior to the initiation of collection-related activities, to give the debtor an opportunity to dispute the debt. I.Q. Data policy is to suspend collection activities on an account if a written dispute is received within the validation period, and I.Q. Data must provide written verification of the debt. If I.Q. Data is unable to provide verification of the debt in response to a consumer's written request for verification, I.Q. Data must cease all collection efforts on the account. (Ex. C ¶ 39 and its Ex. 5 § 3.2).

47.    If a lawsuit is filed, I.Q. Data assigns an attorney to review all issues related to an alleged FDCPA violation, and stops all collection efforts on a disputed balance. (Ex. C ¶ 40).

48.    I.Q. Data followed the aforementioned policies and procedures with respect to its contract with D&K and collection on Plaintiff's account. (Ex. C ¶¶ 41, 43, 45).

49.    Based on I.Q. Data's policies and procedures, if I.Q. Data had known D&K referred it an account balance that included amounts D&K was not legally entitled charge

Plaintiff, I.Q. Data would never had sought to collect that amount from Plaintiff. (Ex. C. ¶ 44).

50. Once I.Q. Data learned that D&K charged Plaintiff an amount it was allegedly not legally permitted to collect, I.Q. Data immediately stopped its attempts to collect on Plaintiff' account. (Ex. C ¶ 45).

51. Apart from the allegations in this case, I.Q. Data has no record of any known instance in which D&K has referred I.Q. Data an account for collection that included attorney fees charged in connection with an eviction action. Apart from the allegations in the present case, I.Q. Data has no record of any known instance in which D&K has referred I.Q. Data an account for collection that included any amount it was allegedly not entitled to collect. (Ex. C ¶ 46).

Dated: December 28, 2020                    Respectfully submitted,

                                           By:   /s/ *Christina R. Spiezia*
                                                 GORDON REES SCULLY MANSUKHANI LLP
                                                 Paul Gamboa (#6282923)
                                                 Christina R. Spiezia (#6316508)
                                                 One North Franklin, Suite 800
                                                 Chicago, Illinois 60606
                                                 Phone: (312) 619-4937
                                                 Fax: (312) 565-6511
                                                 pgamboa@grsm.com
                                                 cspiezia@grsm.com
                                                 *Attorneys for Defendant*

10

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that on December 28, 2020, a true and complete copy of the filed foregoing document was served upon the below attorneys by filing same electronically with the United States District Court, Northern District of Illinois, via the CM/ECF electronic filing system.

*Attorneys for Plaintiff*
Mary Frances Charlton
Arturo Hernandez
Patricia Nix Hodes
Chicago Coalition for the Homeless
70 E. Lake Street, Suite 720
Chicago, Illinois 60601
(312) 459-6607
maryfrances@chicagohomeless.org
arturo@chicagohomeless.org
pnixhodes@yahoo.com

Andrea Bopp Stark
Charles Marshall Delbaum
National Consumer Law Center
7 Winthrop Square
Boston, Massachusetts 02110
(617) 542-8010
astark@nclc.org
cdelbaum@nclc.org

Dated: December 28, 2020        Respectfully submitted,

By:   /s/ *Christina R. Spiezia*
GORDON REES SCULLY MANSUKHANI LLP
Paul Gamboa (#6282923)
Christina R. Spiezia (#6316508)
One North Franklin, Suite 800
Chicago, Illinois 60606
Phone: (312) 619-4937
Fax: (312) 565-6511
pgamboa@grsm.com
cspiezia@grsm.com
*Attorneys for Defendant*

11