# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

YASMINE LAMAR,
Individually and on behalf of a class of
others similarly situated,

        Plaintiff,

   vs.

IQ DATA INTERNATIONAL, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 20-cv-00377

Honorable Judge Gary Feinerman

Magistrate Judge Susan E. Cox

## <u>AFFIDAVIT OF MICHAEL GULBRANSON</u>

I, Michael Gulbranson being duly sworn on oath, state as follows:

1. I have personal knowledge of the matters set forth in this Affidavit and, if sworn as a witness, I would and could competently testify hereto.

2. I am employed as Vice President of Operations at I.Q. Data International, Inc. ("I.Q. Data"). I have held this position since June 2008.

3. As Vice President of Operations, I have gained extensive knowledge of the various aspects of I.Q. Data's records, operations, and collection practices, including but not limited to I.Q. Data's contracts with creditor clients, the accounts placed with I.Q. Data for collection, policies and procedures pertaining to accounts placed with I.Q. Data for collection, and I.Q. Data's policies and procedures generally.

4. I.Q. Data is engaged by certain creditor clients to aid in the collection of debts.

5. I.Q. Data is a party to a contract ("Collection Agreement") with Draper and Kramer, Inc. ("D&K"). Under the terms of the Collection Agreement, D&K (Creditor) retained I.Q. Data (Collector) to collect D&K's accounts receivables. The Collection Agreement was

entered into as of April 4, 2017 and is still in effect today. A true and correct copy of the

Collection Agreement, maintained in the regular course of I.Q. Data's business, is attached to

this Affidavit as **Exhibit 1**.

6.      The Collection Agreement provides:

> **1.2 Creditor's Duties.** Creditor (i) warrants that the Account Information on the Delinquent Accounts are accurate, valid, true and correct…

(Ex. 1 ¶ 1.2).

7.      The Collection Agreement also contains a warranty from D&K that it will:

> (v) comply with Collector's requests for documentation, statements, photographs, invoices; and (vi) comply with requests for the Creditor to send or transmit Account Information to the Responsible Party evidencing the debt.

(Ex. 1 ¶ 1.2).

8.      Under the Collection Agreement, D&K expressly assumes responsibility for

compliance with all applicable laws, rules, regulations, and ordinances, including local housing

laws, pursuant to a provision that states:

> **2.1 Contractor's Relationship.** …. Collector and Creditor each assume full responsibility for their own compliance with any and all applicable laws, ordinances, rules and regulations, including … (b) Creditor's obligation to comply with federal, state or local housing laws, together with any laws or rules regulating a landlord/tenant relationship.

(Ex. 1 ¶ 2.1).

9.      The Collection Agreement contains an express Indemnification provision

requiring D&K to indemnify I.Q. Data from any claims or damages to the extent those claims or

damages were caused by D&K in performing its duties under the Collection Agreement or in

connection with the accuracy or validity of the delinquent accounts. (Ex. 1 ¶ 6.1).

10.      Importantly, for I.Q. Data's purposes, D&K "expressly warrants that all

Delinquent Accounts are legally due and owing." (Ex. 1 ¶ 6.2).

11.     Under certain collection agreements, including the Collection Agreement with D&K, I.Q. Data performs "Pre-Collect" services before an account is formally assigned to I.Q. Data to begin its standard collection services. The Collection Agreement contains a "Pre-Collect Service" provision, which states, in relevant part:

> **Pre-Collect Service:** Collector will send two (2) notices to the former resident. If the resident pays within thirty (30) days from the move out date, whether to the property directly or to Collector, the Collector's fee will be [ ]…
>
> If an account is not paid within thirty (30) days of the move-out date, Collector will classify the account as a standard collection service ("Non Pre-Collect").

(Ex. 1 at p. 5).

12.     When D&K refers an account to I.Q. Data for collection, I.Q. Data integrates with D&K's property management software, Yardi, which contains certain information related to the resident debtor and his/her account. I.Q. Data's software synchronizes with Yardi and generates I.Q. Data's own document (hereinafter referred to as the "Account Information Report") by populating a form with certain information in Yardi pertaining to the account, including the resident debtor's name, address on file, contact information, lease dates, and outstanding balance.

13.     When I.Q. Data is referred an account by D&K, I.Q. Data is not provided any information that states whether D&K filed an eviction action against its former tenant/the debtor, or whether D&K charged its former tenant/the debtor legal fees in connection with an eviction action.

14.     Attached to this Affidavit as **Exhibit 2** is a true and correct copy of I.Q. Data's Account Information Report for Plaintiff Yasmine Lamar, which was generated in the manner described in paragraph 12 above, and maintained in the regular course of I.Q. Data's business. It

identifies an outstanding balance on Plaintiff's account of $3,969.10, and identifies Plaintiff's address on file.

15. I have reviewed the information received by I.Q. Data from D&K related to Plaintiff and her account. Consistent with process and procedure described in paragraphs 12-13 above, at the time Plaintiff's account was referred to I.Q. Data for collection, I.Q. Data was not provided with any documents and was not provided with any information that indicated whether D&K filed an eviction action against Plaintiff or charged Plaintiff attorneys' fees in connection with any eviction action.

16. I.Q. Data enters all accounts referred to it for collection into I.Q. Data's collection system, and notates all attempts to collect on that account. These notes include those actions taken with respect to the account, correspondences sent, and calls made or received.

17. When I.Q. Data performs pre-collect services in connection with an account, it loads the account into is collection system as "pre-collect," and a form letter entitled "00 PRECOLLECT LETTER" is automatically generated by the system to be sent to the debtor as the initial communication.

18. The account notes for the debtor reflect the date that the 00 PRECOLLECT LETTER request is generated in the system, and I.Q. Data's letter vendor mails out the letter the next business day.

19. I have conducted a detailed review of the account notes for Plaintiff Yasmine Lamar (hereinafter referred to as the "Account Notes"), which are maintained in the regular course of I.Q. Data's business. A true and accurate copy of the Account Notes are attached to this Affidavit as **Exhibit 3**.

20. Based on my review of the notations contained within the Account Notes,

4

Plaintiff's account was assigned to I.Q. Data for "pre-collect" service on September 7, 2018, and I.Q. Data performed "pre-collect" services with respect to the account until September 27, 2018, at which time standard collection services began. (*See* Ex. 3 at p. 1).

21.     Based on my review of the notations contained within the Account Notes, and the documents associated with Plaintiff's account, on or about Friday, September 7, 2018, I.Q. Data's system generated a request for the 00 PRECOLLECT LETTER to be issued in connection with Plaintiff's account, and the 00 PRECOLLECT LETTER was mailed out to Plaintiff on Monday, September 10, 2018 (because September 7, 2018 was a Friday). (*See* Ex. 3 at p. 1).

22.     A true and correct copy of the 00 PRECOLLECT LETTER, maintained in the regular course of I.Q. Data's business is attached to this Affidavit as **Exhibit 4**. The 00 PRECOLLECT LETTER  was mailed to Plaintiff on September 10, 2018

23.     The 00 PRECOLLECT LETTER is a form letter which includes the following validation language as required by 15 U.S.C. § 1692g(a)(3-4):

> "Unless you notify this office within 30 days after receiving this
> notice that you dispute the validity of this debt or any portion thereof,
> this office will assume this debt is valid. If you notify this office in
> writing within 30 days after receiving this notice that you dispute the
> validity of this debt or any portion thereof, this office will obtain
> verification of the debt or a copy of a judgment and mail you a copy
> of such judgment or verification."

(Ex. 4).

24.     For all accounts assigned to I.Q. Data for collection, whether pre-collect services are performed pursuant to the collection agreement or not, I.Q. Data's system automatically generates a request for an "R01 Letter" to be sent to the debtor. The "R01 Letter" is a form letter which contains the language quoted in paragraph 23 above, as required by 15 U.S.C. § 1692g(a)(3-4). For accounts on which no pre-collect services are performed, the "R01 Letter" is

5

automatically generated and sent as the first communication to the debtor.

25.     Based on my review of the notations contained within Plaintiff's Account Notes, and the documents associated with Plaintiff's account, the 00 PRECOLLECT LETTER was sent to the address D&K provided to I.Q. Data as Plaintiff's address on file. (*See* Ex. 2; Ex. 4).

26.     Based on my review of the notations contained within Plaintiff's Account Notes, I.Q. Data did not receive any record of the 00 PRECOLLECT LETTER sent to Plaintiff as being returned as undeliverable. (*See* Ex. 3 at p. 1).

27.     Based on my review of the notations contained within the Account Notes, the 00 PRECOLLECT LETTER dated September 10, 2018, attached as Exhibit 4, was I.Q. Data's initial communication to Yasmine Lamar. (*See* Ex. 3 at p. 1).

28.     As noted above, I.Q. Data notates all attempts to collect on an account, including all actions taken with respect to the account, all correspondences sent, and all calls made or received, and Plaintiff's Account Notes contain no record of any calls, letters, or other communications before the 00 PRECOLLECT LETTER dated September 10, 2018. (*See* Ex. 3 at p. 1).

29.     I.Q. Data maintains extensive policies and procedures designed to ensure compliance with the Fair Debt Collection Practices Act ("FDCPA") generally, and to ensure it is only collecting debts that are legally due and owing, and that it is legally authorized to collect.

30.     As a matter of policy, I.Q. Data ensures that its contracts with creditor clients require the creditor to warrant that all information provided in connection to a debtor's delinquent account is accurate, valid, true and correct, and that all amounts referred to I.Q. Data for collection are legally due and owing.

31.     As a matter of policy, I.Q. Data ensures that its contracts with creditor clients

require the creditor to comply with I.Q. Data's requests for documentation evidencing the debt.

32. As a matter of policy, I.Q. Data ensures that its contracts with creditor clients require the creditor to assumes responsibility for compliance with all applicable laws, rules, regulations, and ordinances.

33. As a matter of policy, I.Q. Data ensures that its contracts with creditor clients require the creditor to indemnity I.Q. Data for damages in connection with the creditor providing inaccurate information regarding validity of delinquent accounts.

34. Attached to this Affidavit as **Exhibit 5** is a true and correct copy of I.Q. Data's Fair Debt Collection Practices Act Policy. I.Q. Data's FDCPA Policy is maintained in the regular course of its business. All I.Q. Data employees responsible for collection activity are required to read and understand I.Q. Data's FDCPA Policy, as well as receive training on this Policy, the FDCPA, and related state law requirements, prior to engaging in collection activity. Additionally, I.Q. Data employees must also take all required refresher training, as directed by the Compliance Department and Operations Management. (Ex. 5 § 3.9).

35. All I.Q. Data employees are required to partake in a two-week FDCPA training course, where the statue is covered extensively.

36. FDCPA training at I.Q. Data includes: (1) participatory FDCPA training modules; (2) administered testing to new employees regarding their understanding of the training modules; (3) provision of policies and standard operating procedures to employees pertaining to the collection of accounts; (4) affirmation from each employee that they have both read and agree to be bound by the policies and standard operating procedures provided them; (5) demonstration and lecture provided to employees as to how to remain compliant with the FDCPA; and (6) refresher training administered to every employee regarding their understanding of the FDCPA.

37.    I.Q. Data maintains "Validation" policies and procedures further designed to prevent collection of debts that are not legally due and owing in the event such a debt has been referred. Specifically, these policies are designed to immediately stop collections on an account where a creditor has somehow failed to comply with its contractual obligations and has referred I.Q. Data a debt for collection that is not legally due and owing. (Ex. 5 § 3.2).

38.    I.Q. Data's FDCPA training for employees includes education on provisions of the FDCPA regarding validation notice and the validation procedure, including the purpose and goal of validation, required contents of the validation notice, timing on when the validation notice must be sent, what to do when a consumer disputes the debt, and how to respond to and handle a dispute.

39.    I.Q. Data's FDCPA Policy requires a validation notice to be mailed prior to the initiation of collection-related activities, to give the debtor an opportunity to dispute the debt. I.Q. Data policy is to suspend collection activities on an account if a written dispute is received within the validation period, and I.Q. Data must provide written verification of the debt. If I.Q. Data is unable to provide verification of the debt in response to a consumer's written request for verification, I.Q. Data must cease all collection efforts on the account. (Ex. 5 § 3.2).

40.    If a lawsuit is filed, I.Q. Data assigns an attorney to review all issues related to an alleged FDCPA violation, and stops all collection efforts on a disputed balance.

41.    I.Q. Data followed the aforementioned policies and procedures with respect to its contract with D&K and collection on Plaintiff's account.

42.    I.Q. Data ensured that its Collection Agreement with D&K contained the following: (a) an express warranty regarding the accuracy of accounts referred; (b) a requirement that D&K provide documentation validating the debt upon request; (c) a warranty that D&K

8

assumed responsibility for compliance with all applicable laws, ordinances, rules and regulations, including compliance with federal, state, and local housing laws, and any laws or rules regulating a landlord/tenant relationship; (d) an indemnification provision in the event D&K provided inaccurate information regarding the validity of an account; and (e) an express warranty that "all Delinquent Accounts are legally due and owing." I.Q. Data relies on these contractual provisions and the express warranty of D&K in the Collection Agreement that all account information on the delinquent accounts referred to I.Q. Data is accurate, valid, true and correct and legally due and owing.

43. The information D&K provided to I.Q. Data in connection with Plaintiff's account at the time it was referred provided no indication that the outstanding balance included attorneys' fees that D&K charged Plaintiff in connection with its eviction action. The information D&K provided to I.Q. Data in connection with Plaintiff's account at the time it was referred provided no indication that the outstanding balance included fees that might somehow run afoul of the Chicago Residential Landlord and Tenant Ordinance.

44. Based on I.Q. Data's policies and procedures, if I.Q. Data had known D&K referred it an account balance that included amounts D&K was not legally entitled to charge Plaintiff, I.Q. Data would not have sought to collect that amount from Plaintiff.

45. Based on my review of the notations contained within Plaintiff's Account Notes, once I.Q. Data learned that D&K charged Plaintiff an amount it was allegedly not legally permitted to collect, I.Q. Data immediately stopped its attempts to collect on Plaintiff' account.

46. I have reviewed I.Q. Data's records, and apart from the allegations in the present case, I.Q. Data has no record of any known instance in which D&K has referred I.Q. Data an account for collection that included attorney fees charged in connection with an eviction action.

9

Apart from the allegations in the present case, I.Q. Data has no record of any known instance in which D&K has referred I.Q. Data an account for collection that included any amount it was allegedly not entitled to collect.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22 nd day of December, 2020.

_____
Michael Gulbranson

10